UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Rhonda L. George,

          Plaintiff,

   vs.                      REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

           Defendant.        Civ. No. 05-1144 (PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied her application for Disability Insurance

Benefits ("DIB"). The matter is now before the Court upon the parties' cross-Motions

for Summary Judgment. The Plaintiff has appeared by Jennifer G. Mrozik, Esq., and

the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.

For reasons which follow, we recommend that the Plaintiff's Motion for Summary

Judgment be denied, and that the Defendant's Motion be granted.

## II.  Procedural History

The Plaintiff applied for DIB on June 29, 2001, at which time, she alleged that she became disabled on September 28, 1986. [T. 80-82]. Her claims were denied upon initial review, and upon reconsideration. [T. 53-66]. The Plaintiff timely requested a Hearing before an Administrative Law Judge ("ALJ") and, on January 15, 2003, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by counsel. [T. 36]. Thereafter, on April 18, 2003, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 36-50]. The Plaintiff filed additional medical evidence, and lay witness statements with the Appeals Council, in connection with her request for an Administrative Review but, on July 29, 2005, the Appeals Council declined to review the matter further. [T. 12-13]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

## III.  Administrative Record

A.  Factual Background. At the time of the ALJ's decision, the Plaintiff was forty-seven (47) years old, and was a high school graduate. [T. 37]. She is right-

handed, [T. 13A], and has skilled, sedentary, past relevant work as a secretary, [T. 37]. The Plaintiff alleges that she cannot work due to cerebral hemorrhage, arthritis, breast cancer, seizures, strokes, pelvic and hip fractures, foot problems, osteoporosis, arteriovascular malformation ("AVM"), fibromyalgia, and chronic fatigue. [T. 36, 80-82, 92].

1.    Medical Records Submitted to the ALJ Prior to the Hearing.

a.    Evidence Relating to the Period Prior to the Expiration of the Plaintiff's Insured Status.

The available medical records reflect that the Plaintiff gave birth to her first child in July of 1985. [T. 169-90]. On September 28, 1986, she gave birth to her second child, and underwent a successful tubal ligation. [T. 161-65, 191-93]. At that time, she reported no major health issues except for variscosities, a past tonsillectomy, and smoking a pack of cigarettes a day. [T. 167]. In June of 1986, Dr. Steve Rockman noted that the Plaintiff was "doing well," with no medical problems except for an inability to breast feed. [T. 855]. On a follow-up visit in October of 1986, the Plaintiff complained of shoulder pain, and Dr. Rockman prescribed Tylenol with codeine. Id. A few days later, on October 10, 1986, the Plaintiff again called Dr. Rockman, and complained of pain in her shoulders, neck, and head. Id. Physical

therapy reduced her pain by "about 50%," and she was prescribed Robaxin.[1]  Id.  On

October 13, 1986, he referred the Plaintiff to Dr. Reininger, and noted a possible neck

strain injury.  Id.  On October 13, 1986, x-rays of the Plaintiff's chest and cervical

spine proved negative. [T. 238].

Dr. Rockman recorded that the Plaintiff complained of right-sided pain in

March of 1988. [T. 856].  The Plaintiff had voluntary surgery to remove varicose

veins in both of her legs in May of 1988, after she reported increasing pain and

discomfort when she was on her feet.  [T. 208].  At the time of the surgery, Dr.

Satitpunwaycha Pon noted that she was "well developed," and that the "pertinent

physical findings were normal."  [T. 208-23].  In January of 1989, the Plaintiff saw

Dr. Rockman with complaints of irregular menstrual bleeding, accompanied by

dizziness and nausea, but those symptoms had abated by the end of the month.  [T.

856-57].

Medical records of April 2, 1990, report that the Plaintiff complained of pain

in her knee when she played softball, and also suggest that she had previously had a

Doppler flow study for a potential valvular irregularity.  [T. 861].  In June of 1990,

---

[1]Robaxin is "a central nervous system (CNS) depressant with sedative and musculoskeletal relaxant properties."  Physicians' Desk Reference, at 771 (60th Ed. 2006).

the Plaintiff complained of pain in her right ear for several days, and she was prescribed Amoxicillin[2] then, and again, on July 26, 1990. [T. 327]. In August of 1990, the Plaintiff stated that she was suffering from pelvic and back pain, and was referred to an orthopedist. [T. 860]. She again underwent a Doppler ultrasound carotid evaluation, that revealed no abnormalities with the exception of a high velocity flow primarily on the left side, which Dr. Peter Curtis noted was seen frequently in younger patients. [T. 230].

Also in August of 1990, the Plaintiff underwent an abdominal ultrasound, which was negative. [T. 228]. On August 13, 1990, Dr. Rockman saw the Plaintiff for complaints of a lump in her breast, but he found no abnormalities, and he recommended treatment for depression. [T. 859]. Records from September 5, 1990, disclose that the Plaintiff was diagnosed with allergic rhinitis, and was provided prescriptions of Hismanal,[3] and nasal corticosteroids. [T. 327]. Later that month, the Plaintiff complained of tastebud difficulties, which may have been connected to the

---

[2]Amoxicillin is "a semisynthetic antibiotic * * * with a broad spectrum of bactericidal activity against many gram-positive and gram-negative microorganisms." Physicians' Desk Reference, at 1315 (60th Ed. 2006).

[3]Hismanal is the trademark for a preparation of astemizole, which is "used in the treatment of * * * seasonal allergic rhinitis." Dorland's Illustrated Medical Dictionary, at 162, 824 (29th Ed. 2000).

use of Tenormin.[4]  <u>Id.</u>  The Record also reflects that the Plaintiff was taking Ativan.[5]

<u>Id.</u>

On September 26, 1990, the Plaintiff returned to her doctor complaining of

esophageal reflux, and a spastic colon.  [T. 225-26].  Again, test results were normal.

[T. 226].   When she was seen on September 29, 1990, for a sore throat and trouble

swallowing, as well as for a left ear ache and diarrhea, she reported that she was taking

several medications, including Ativan, Zantac,[6] and Mycelex.[7]  [T. 224].  Notations

from October 24, 1990, reveal that the Plaintiff continued to complain of tastebud

---

[4]Tenormin is "used in the management of hypertension," for "long term management of patients with angina pectoris," and in "patients with definite or suspected acute myocardial infarction."  <u>Physicians' Desk Reference</u>, at 696 (60th Ed. 2006).

[5]Ativan is a trademark for preparations of lorazepam, that is "a benzodiazepine with anxiolytic and sedative effects * * * [for] the treatment of anxiety disorders." <u>Dorland's Illustrated Medical Dictionary</u>, at 67, 1027 (29th Ed. 2000).

[6]Zantac is a trademark for a preparation of ranitidine hydrochloride, that is "used to inhibit gastric acid secretion in the treatment of gastric and duodenal ulcer, gastroesophageal reflux, and conditions that cause gastric hypersecretion." <u>Dorland's Illustrated Medical Dictionary</u>, at 1530, 1996 (29th Ed. 2000).

[7]Mycelex is a trademark for a preparation of clotrimazole, that is "a broad-spectrum antifungal agent, applied topically to the skin in the treatment of candidiasis * * * and administered intravaginally in the treatment of vulvovaginal candidiasis." <u>Dorland's Illustrated Medical Dictionary</u>, at 366, 1162 (29th Ed. 2000).

difficulties and headaches.  [T. 327].  She was prescribed a Medrol Dosepak[8] and, subsequently on November 2, 1990, Ansaid.[9]  Id.  Dr. Rockman's report of December 7, 1990, discloses that he diagnosed the Plaintiff with depression.  [T. 860].

> b.    Evidence Relating to the Period After the Expiration of the Plaintiff's Insured Status.

On February 26, 1991, Dr. Peggy Guard referred the Plaintiff to Dr. Michael D. Lesem for a psychological evaluation.  [T. 241].  Dr. Lesem found that the Plaintiff suffered from panic attacks and major depression, and sometimes from a simultaneous combination of both.  Id.  Although the Plaintiff was in partial remission for both conditions, Dr. Lesem speculated that she had not been able to obtain complete remission because she had difficulty taking a therapeutic dose of her prescribed antidepressants.  Id.  Dr. Lesem expressed confidence that the Plaintiff's "most likely etiology is a functional etiology," and he proposed proceeding

---

[8]Medrol is a trademark for preparation of methylprednisolone, that is "used in replacement therapy for adrenal insufficiency and as an anti-inflammatory and immunosuppressant in a wide variety of disorders."  Dorland's Illustrated Medical Dictionary, at 1072, 1105 (29th Ed. 2000).

[9]Ansaid is a trademark for a preparation of flurbiprofen, that is "a nonsteriodal anti-inflammatory agent * * * administered orally in the treatment of rheumatoid arthritis and osteoarthritis."  Dorland's Illustrated Medical Dictionary, at 95, 690 (29th Ed. 2000).

with a trial of medication that he hoped would place her in complete remission.  Id.
In March of 1991, Dr. Lesem performed a routine EEG on the Plaintiff for an
evaluation of her panic attacks.  [T. 242].  The EEG was normal, and Dr. Lesem noted
no seizures or epoleptiform discharges.  Id.  Dr. Rockman's records of April 24, 1991,
note that the Plaintiff might be experiencing some anxiety on Ativan, and he
prescribed Sinequan[10] on April 26, 1991. [T. 863].

The Plaintiff saw Dr. O'Donnell on August 27, 1991, with complaints of
migraines and pain in her left shoulder, under her left rib area, and in her left knee.
[T. 319].  She reported that she had been diagnosed with fibromyalgia in the past.  Id.
Dr. O'Donnell diagnosed the Plaintiff with fibromyalgia, neck spasms without
radiculopathy, irregular menses, anxiety, depressive disorder, and abdominal pain.
Id.  He referred the Plaintiff for an abdominal ultrasound and laboratory tests, and he
prescribed Skelaxin.[11]  Id.  The ultrasound and laboratory tests were negative. [T. 318,
307].

---

[10]Sinequan is a trademark for a preparation of doxepin hydrochloride, that is
used to treat "chronic pain, peptic ulcer, pruritus, and idiopathic cold urticaria."
Dorland's Illustrated Medical Dictionary, at 542, 1647 (29th Ed. 2000)

[11]Skelaxin is a trademark for a preparation of metaxalone, that is "a smooth
muscle relaxant used in the treatment of painful muscoskeletal conditions." Dorland's
Illustrated Medical Dictionary, at 1097, 1651 (29th Ed. 2000).

On September 5, 1991, the Plaintiff again complained to her doctor about abdominal pain, but a new ultrasound revealed no irregularities. [T. 317-18]. Later in September of 1991, the Plaintiff was seen by Dr. Thomas R. Carver, where she detailed an eighteen (18) month history of abnormal uterine bleeding, and a chronic history of right lower quadrant discomfort. [T. 243, 316]. An ultrasound showed two (2) thickened cysts on the walls of the Plaintiff's right ovary. [T. 316]. Dr. Carver prescribed birth control pills in order to help control the Plaintiff's abnormal menstrual bleeding. Id.

In October of 1991, the Plaintiff sought treatment for fibromyalgia, pain in both shoulders and in her neck, and for headaches. [T. 305, 312]. The Plaintiff reported that she had received good results in the past with heat and massage treatment in physical therapy, but that, in the past two (2) weeks, her pain had increased. Id. She reported her pain as an eight (8) on a scale of ten (10), and she cited vacuuming and lifting children as precipitating events. Id. The doctor recommended continued physical therapy, id., and noted that the Plaintiff's problems might be exacerbated by her continued habit of "poor posture problems while reclining on the couch." [T. 305]. From October 23, 1991, to October 28, 1991, the Plaintiff reported no improvement in her condition, despite undergoing regular physical therapy. [T. 305].

- 9 -

However, in November 15, 1991, Dr. D. Kurti reviewed a second ultrasound and found that the Plaintiff's ovarian cysts had improved, [T. 304], with a subsequent ultrasound confirming that the cysts had continued to resolve themselves.  [T. 300].

In February of 1992, the Plaintiff saw her doctor for symptoms relating to her history of irritable bowel syndrome, migraines, tension headaches, panic attacks, and fibromyalgia. [T. 245].  Notwithstanding her complaints, her physical exam revealed no abnormalities in her coordination, reflexes, gait, station, or ability to walk.  [T. 245].

In March of 1992, Dr. Leonard J. Cerullo examined the Plaintiff, and noted that she had a history of fibromyalgia involving the cervical muscles and shoulders, as well as migraine headaches on the right side, that did not result in seizures or loss of consciousness.  [T. 248].  At the time, the Plaintiff was taking Fiorinal,[12] as well as Ativan for her anxiety and panic disorder.  Id.  Dr. Tomasz K. Helenowski also evaluated the Plaintiff, and found that there was no evidence of hemorrhage from the lesion, but he did note a left facial droop. [T. 247]. An MRI scan was performed, and

---

[12]Fiorinal is a trademark for a preparation of butalbital, that is "a short- to intermediate-acting barbituate, used as a sedative in combination with an analgesic in the treatment of tension headache." Dorland's Illustrated Medical Dictionary, at 257 (29th Ed. 2000).

confirmed the presence of an AVM, an arteriovenous malformation. Id. The Plaintiff was subsequently referred for Gamma Knife Radiosurgery. [T. 246]. At an evaluation to discuss Gamma Knife Radiosurgery, Dr. Ladislau Steiner noted that the Plaintiff appeared in his office in "generally good health," despite also suffering from mitral valve prolapse and a spastic colon. [T. 250]. Dr. Steiner added that a recent MRI, dated February 12, 1992, had revealed a Sylvian arterial venous malformation on the left. Id. The Plaintiff underwent an angiography on February 24, 1992. Id. Dr. Steiner concluded that the Plaintiff's anxiety and panic disorder were not directly related to the AVM, as she had reported symptoms of anxiety even before she knew about the AVM diagnosis, but that her headaches were often associated with AVM. [T. 251].

Dr. James F. Dupre saw the Plaintiff on August 4, 1992, for headaches, neck and shoulder complaints, and slight left facial droop. [T. 253]. Dr. Dupre wrote that, "[a]t this time, [the Plaintiff] has no complaints except for the neck and shoulder complaints and headaches." Id. Dr. Dupre conducted a "detailed neurological examination" of the Plaintiff's head, neck, spinal column, and extremities, id., and found her to be neurologically entirely normal except for "the slight flattening of the left nasolabial fold and drooping of the left side of the face." [T. 254]. In September

- 11 -

of 1992, the Plaintiff underwent Gamma Knife Radiosurgery at the University of Virginia Medical Center for her AVM. [T. 256]. In August of 1992, and again in September of 1992, the Plaintiff reported pain in both of her shoulders. [T. 284-85].

In February of 1993, the Plaintiff was seen by Dr. Francis S. Lichon for evaluation of fibromyalgia. [T. 338]. She reported suffering from symptoms of fibromyalgia for over two and a half years and, although she was taking Ativan, as well as Fioricet daily for headaches, nothing offered her any regular relief from her pain. Id. Dr. Lichon diagnosed the Plaintiff with chronic fibromyalgia, and recommended regular exercise, stress control, and Zoloft,[13] id., and noted that, "overall, the outlook for fibromyalgia in this particular patient is not good." [T. 339]. The Plaintiff was seen for an MRI on her left shoulder on September 22, 1993. [T. 279]. Dr. Kurti reviewed the results and found that they indicated "mild impairment." Id.

A pelvic ultrasound in February of 1994, revealed that the ovarian cysts, which were previously diagnosed, were still present, but that they did not require any treatment. [T. 276]. On March 17, 1994, the Plaintiff underwent an MRI scan of her

---

[13]Zoloft is a trademark for a preparation of sertraline hydrochloride (1997), that is used as a treatment for "major depressive disorder." Physicians' Desk Reference, at 2581 (60th Ed. 2006).

brain, which showed left temporal parietal AVM, reduced since the examination on February 12, 1992. [T. 273]. Dr. Kurti found the AVM was still present, but reported that the size of the lesion was decreased, and that there was no evidence of hemorrhage or edema. Id.

In May of 1994, the Plaintiff presented with significant right-sided abdominal pain, which came on suddenly. [T. 270]. The Plaintiff told the examining physician that "she has a marked increase of her headaches during the time of her menses." Id. Her physician recommended another pelvic ultrasound, id., which revealed that one cyst had enlarged, while the other had decreased in size. [T. 269]. On May 10, 1994, the Plaintiff reported recurring abdominal pain, as well as an increase in headaches that Dr. O'Donnell felt could be related to the Plaintiff's AVM. [T. 270]. The Plaintiff was diagnosed with fibrocystic breast disease in August of 1994. [T. 265-66]. An MRI, which was performed in October of 1994, revealed that the Plaintiff's AVM lesion was much smaller than before treatment, but unchanged since March of 1994. [T. 260-63, 335].

The Plaintiff saw Dr. Douglas L. Johnson, a neurologist, on April 19, 1995, to discuss her AVM. [T. 331]. She reported that approximately four (4) weeks earlier, she had experienced the onset of severe right-sided weakness, which was starting to

resolve at the time of the examination.  Id.  She underwent an MRI, which revealed

no changes.  Id.  Dr. Johnson noted the Plaintiff's history of panic and anxiety attacks,

depression, and fibromyalgia, and suggested that they might be related to the location

of the AVM, and left temporal lobe.  [T. 332].  On examination, Dr. Johnson reported

that the Plaintiff appeared anxious and exhausted, with continued right side weakness.

Id.  Dr. Johnson concluded the examination by suggesting that the Plaintiff undergo

a new MRI and cerebral angiogram to see if there had been any change in her AVM,

but the tests came back negative.  [T. 332, 458].

   She was seen in June of 1995, for right-side weakness, at which time, she told

her doctor that, "eight years ago," after having her second child, she had an episode

of severe neck pain and right arm weakness.  [T. 356].  In December of 1995, the

Plaintiff presented with lumps in her breast and left breast pain, and was diagnosed

as negative for breast cancer.  [T. 333].

   On May 14, 1996, the Plaintiff was seen by Dr. Francis S. Lichon, complaining

of "pain all over her body."  [T. 336].  She reported that she had suffered from

"constant pain and fatigue of her body" for the past six (6) years, and had trouble

sleeping.  Id.  Dr. Lichon recommended that the Plaintiff cut back on her use of Ativan

and Fioricet, while she continued with Zoloft, and suggested that more physical

activity, and stress reduction, would assist her with her pain management. [T. 337]. In August of 1996, an examination revealed that the Plaintiff had weakness in her right foot. [T. 399].

On October 2, 1996, the Plaintiff sought treatment for acute right shoulder pain, and dated the onset of symptoms to July 20, 1996, when she fell twice in the same week. [T. 341]. She claimed persistent pain in her shoulder since that time, that sometimes extended into her face on the right, but no symptoms in her left shoulder. Id. The treating physician diagnosed myofascial pain syndrome of the right scapula, and cervical region, as well as right shoulder biceps tendinitis, and recommended physical therapy, with home exercises to reduce tenderness. [T. 341-42]. The Plaintiff also had an MRI, which revealed a partial tear of her rotator cuff. [T. 341]. In December of 1996, the Plaintiff was still complaining of "excruciating" pain in the right shoulder, and accompanying weakness, despite having undergone physical therapy. [T. 344]. On examination, she had difficulty lifting her arm above shoulder level. Id.

In January of 1997, [T. 351], the Plaintiff was given trigger point injections and prescribed Neurontin[14] for headaches and chronic pain. [T. 355]. A bone scan revealed increased vascular activity to the left hand, wrist, and forearm, and the treating physician noted that the Plaintiff did not have typical findings for reflex sympathetic dystrophy ("RSD"). [T. 386]. Despite this, in February of 1997, she told her physician that she continued to "hurt from head to toe." [T. 430].

The Record reveals that, in February of 1998, the Plaintiff was seen at the Mayo Clinic for a pain program, when she sustained a subarachnoid hemorrhage which required an aneurysm clipping. [T. 467-68; 504; 562]. In April of 1998, she reported being able to lift only 2-3 pound weights at any one time, and being able to walk three blocks at a time, after which she had pain in her shoulder, and mild pain and weakness in her lower right extremity. [T. 465]. She said that she was in constant pain, with the intensity ranging from a six (6) to a nine (9) on a scale of ten (10). [T. 464]. As a result of the pain, in January of 1998, she had taken to occasionally using a wheelchair, but she admitted that she had no trouble climbing stairs, or standing for fifteen (15) or twenty (20) minutes at a time, after which time, she would need a

---

[14]Neurontin is a trademark for a preparation of gabapentin, that is used in the treatment of partial seizures. Dorland's Illustrated Medical Dictionary, at 721, 1212 (29th Ed. 2000).

break.  [T. 465].  The Plaintiff was not able to vacuum because of significant shoulder pain.  Id.  At that time, the doctor recommended that she continue with Fioricet for her pain.  [T. 466].  On May 7, 1998, the Plaintiff was brought into the emergency room after slipping into a coma, and a CAT scan of her brain revealed renewed bleeding.  [T. 560].

In September of 1998, the Plaintiff was diagnosed with breast cancer,  [T. 468], for which she had a lumpectomy, followed by radiation therapy.  [T. 471, 539, 551].  During his consultation with her, in order to discuss management for her cancer, the attending physician noted that the Plaintiff suffered from aphasia relating to her previous aneurysm, and relied on her husband to assist her in speaking.  [T. 468].

In December of 1998, the Plaintiff reported right foot pain and swelling, in addition to continued right shoulder pain and headaches.  [T. 489].  The physician diagnosed her with probable sympathetic mediated pain syndrome, related to her central nervous system injury from her aneurysm, as well as chronic pain, anxiety syndrome, potential partial seizure disorder, and migraines.  [T. 490].  However, an EEG, in March of 1999, ruled out any seizure disorder.  [T. 503].  In a visit later that month, in order to initiate physical therapy for her right shoulder immobility, the Plaintiff reported being unable to write or to drive, as well as having a limited memory

that made following commands difficult.  [T. 517].  She  reported the pain in her

shoulder as an eight (8) on a scale of ten (10). [T. 525].  In June of 1998, the Plaintiff

had a resection of her AVM, and experienced aphasia, apraxia, and right hemiparesis

as a result, but her speech problems improved with therapy.  [T. 593].  However, her

physical therapist noted that she continued to have difficulty recalling words,

understanding and following directions, and recalling more than one piece of

information at a time.  Id.  She was also unable to read books, but was able to read

short articles and labels.  [T. 594].  In October of 1998, the Plaintiff underwent a CAT

scan of her spine, that revealed no herniated disc, or other abnormality. [T. 536].

The Record discloses that the Plaintiff underwent ongoing treatment in 1999 for

reflex sympathetic dystrophy ("RSD"), with osteoporosis.  [T. 628; 658].  In a visit

on December 22, 1999, despite complaining of continued headaches, the Plaintiff

reported no new symptoms, [T. 604], and was started on Mexiletine[15] for pain. [T.

617].  After a fall in her bathroom in January of 2000, she reported a radiating hip and

lower back pain, [T. 624, 630], and was successfully operated on for a left femoral

neck fracture.  [T. 625].  However, both before and after the operation, the Plaintiff

---

[15]Mexiletine is a trademark for a preparation of mexiletine hydrochloride, that
is "an oral antiarrhythmic agent * * * used in the treatment of ventricular
arrhythmias."  Dorland's Illustrated Medical Dictionary, at 1107 (29th Ed. 2000).

required the use of a walker for mobility, [T. 635], later moving to a cane.  [T. 640].

She suffered another fall at home in March of 2000, that left her with a

subtrochanteric femur fracture and caused further hip pain. [T. 712, 714].   An

evaluation of her recovery, in June of 2000, found that she was making good progress

and could walk with a cane. [T. 805].  By October of 2000, the Plaintiff reported that

her continuing right shoulder pain had expanded into the right side of her face.  [T.

637].  The Plaintiff underwent an appendectomy in September of 2000, and was

discharged without complications.  [T. 688-96].

Notes from visits the Plaintiff made to a pain management clinic, from August

of 2000 through May of 2001, disclose that she was continuing to suffer  significant

pain in her right lower extremity, but was experiencing "good results" from taking

Neurontin and Mexiletine for her pain, [T. 679-87, 699], as well as Effexor[16] for

obsessive compulsive disorder.  [T. 699].  In June of 2001, the Plaintiff reported pain

and swelling in her left foot, and accompanying pain in the left hip.  [T. 658-60].  A

bone scan confirmed that she had moderate to relatively severe osteoporosis. [T. 665].

---

[16]Effexor is a trademark for a preparation of venlafaxine hydrochloride, that is "used as an antidepressant."  Dorland's Illustrated Medical Dictionary, at 570, 1953 (29th Ed. 2000).

2.     <u>Medical Records Introduced after the Hearing</u>.  After the Hearing, the Plaintiff introduced additional medical records, that were accepted into evidence and were considered by the Appeals Council.   Most of the records duplicate, or confirm the medical events, that were previously included in the Plaintiff's medical history, with only a few addressing potential symptoms of disability that were manifested by the Plaintiff prior to the deadline of December 31, 1990, for disability eligibility.

A series of unsigned, handwritten reports, chronicle the Plaintiff's medical history from September of 1991, until September of 2002. [T. 934-55].  In notes dated September 26, 1991, the writer reports that the Plaintiff had reported some sexual abuse as a child, and that she suffered from depression, migraine headaches, and anxiety.  [T. 934].  In November of 1991, the same writer noted that the Plaintiff reported muscular tension and vascular headache.  [T.936].

On February 11, 1992, the Plaintiff was seen at the Naperville Headache Clinic, where she reported that she had experienced an episode, that had lasted several weeks, in which she had right upper extremity pain and weakness, as well as blurred right eye vision.  [T. 968].  The attending physician, Dr. Hans Evers, diagnosed the Plaintiff with headaches related to a vascular abnormality of the brain.  [T. 969].

The additional materials also reveal some disagreement about the date of the initial diagnosis of AVM in the Plaintiff.  In a letter dated May 14, 1996, Dr. O'Donnell recites the Plaintiff's history, and characterizes her right side weakness as developing "ten years ago," while suggesting that this problem had worsened "six years ago," and that, in that period, she had suffered from "constant pain and fatigue in her body."  [T. 962].  Discharge papers from January 12, 1998, after the Plaintiff was admitted with a subarachnoid hemorrhage, state that the Plaintiff had experienced AVM, with an episode of hemorrhage, "11 years ago."  [T. 1024].  Similarly, a medical Report dated May 7, 1998, reflects that the Plaintiff was found to have an AVM "approximately ten years ago," when she had a massive intracerebral hemorrhage.  [T. 1022].  However, records from January 30, 1995, report that the Plaintiff was diagnosed with AVM "four years ago."  [T. 1030].  A document from October 24, 2000, states that the Plaintiff experienced her first AVM rupture in "1986 or 1987," and adds that it ruptured twice in 1998.  [T. 1035].  On admission to the Rehabilitation Institute of Chicago, in May of 1998, the record notes that the Plaintiff was first diagnosed with AVM in 1992. [T. 1048].  In addition, Dr. Hoj has submitted a letter in which he refers to the discovery of her AVM in 1992.  [T. 831].  Finally, the Plaintiff herself submitted a letter, in conjunction with her request for review by the

Appeals Council, in which she states that her AVM was diagnosed in "1991 or 1992." [T. 880].

B.    Hearing Testimony.  The Hearing on January 15, 2003, commenced with some opening remarks from the ALJ.  [T. 1262].  The Plaintiff's attorney did not object to any of the evidence in the Record, and the ALJ allowed the Plaintiff's attorney to add Exhibits 1A-2A, 1B-10B, 1D-4D, 1E-16E, and 1F-47F to the Record.  Id.  After the Plaintiff's attorney delivered an opening statement explaining the significance of the supplemental Exhibits, the ALJ began questioning the Plaintiff. [T. 1262-63].

The Plaintiff testified that she lived with her husband, a part-time teacher, and two (2) children, ages sixteen (16) and seventeen (17). [T. 1264].  She related that she had a twelfth-grade education, with no further vocational training. Id.  The ALJ asked the Plaintiff why she felt that, prior to December of 1990, she was not able to work a full-time job. Id.  The Plaintiff explained that she believed that she had a stroke after the birth of her second daughter, in 1986, that manifested itself as a severe headache, and left her with weakness in her right arm. Id.  On questioning, the Plaintiff admitted that the incident, in 1986, was not diagnosed as a stroke until 1992, when her AVM was found during an MRI. [T. 1265].  The ALJ asked the Plaintiff how the residuals

from the stroke affected her, and she explained that she had aphasia and apraxia, which hindered her ability to communicate in situations when she was not face-to-face with others.  Id.  The Plaintiff testified that she remained in the hospital for three (3) days after the birth of her second daughter, and that, after she came home, she was able to take care of both of her children with the help of members from her church. [T. 1266-67].

Next, the ALJ asked the Plaintiff about where she had lived since 1986.  Id. The Plaintiff explained that, in 1991, she and her family had moved from their two (2) story, four (4) bedroom house in Texas, to Naperville, Illinois.  [T. 1267-68].  At the time that the Plaintiff was living in Texas, her husband was working full-time as an engineer for Amoco, and the Plaintiff stayed at home to take care of her two (2) daughters, and her husband's three (3) children from a previous relationship.  Id.  The ALJ asked the Plaintiff what she would do with the children.  Id.  The Plaintiff explained that "it was hard," but that she tried "to do a lot with my children," such as going to parks and playgroups.  [T. 1268-69].

The Plaintiff reported being able to drive when she lived in Texas.  [T. 1269]. The ALJ asked if the Plaintiff had any trouble sitting, standing, or walking, during her time in Texas, [T. 1270], and she responded that she had right-sided weakness,

headaches, and had to take naps.  [T. 1271].  She added that she was able to read and write normally during that period, and did not need a wheelchair, or any assistive devices.  Id.  Starting in 1990, the Plaintiff reported experiencing panic attacks and anxiety, that left her unable to function.  [T. 1272].  After the panic attacks started, her sister moved into the Plaintiff's house to help out with the children.  Id.  The Plaintiff's first panic attack took place at a gas station, and left her frozen, and unable to do anything.  Id.  The ALJ asked how often she would have anxiety attacks, and the Plaintiff explained that, after their initial manifestation, she had them "constantly." [T. 1 273].  As a result, she would just stay in bed.  Id.  She saw a psychiatrist, who prescribed medications, including Nortriptyline.[17]   [T. 1273-74].   However, the Plaintiff suggested that the medicines only made her symptoms worse, left her "really, really sleepy," and impaired her functioning -- effects which, she testified, lasted from 1990 until 1999.  [T. 1274].  Eventually, a doctor prescribed Effexor for her, which she described as "a godsend."  Id.

Next, the ALJ asked the Plaintiff how often she had suffered from headaches when she was living in Texas.  Id.  The Plaintiff reported having headaches her whole

---

[17]Nortriptyline is an antidepressant that is "used to treat symptoms of depression and to relieve chronic, severe pain."  Dorland's Illustrated Medical Dictionary, at 1234 (29th Ed. 2000).

life, with no significant changes after the birth of her daughter.  Id.  The ALJ asked

her if she had looked for work when she lived in Texas, and she explained that she

cleaned houses for at least one (1) family, but quit because the position was too hard

on her children.  [T. 1274-75].  She stated that she had to "sit down a lot" at that time,

that her back would hurt, and that she suffered from fibromyalgia, which, she

believed, had been diagnosed in 1990.  [T. 1275].  The Plaintiff explained that all she

"ever felt * * * is pain," and exhaustion.  [T. 1275-76].  Because she had to rest

frequently, she and her husband ceased being able to do things by themselves, or with

the family.  [T. 1276].

Upon questioning by her attorney, the Plaintiff explained that she had problems

with her memory that dated back to 1998.  Id.  The Plaintiff's counsel asked the

Plaintiff when she was first diagnosed with AVM.  [T. 1277].  She explained that she

was diagnosed by Dr. Hans Ebers, who then sent her to Northwestern Hospital for

evaluation for Gamma Knife surgery.  Id.  Although she was warned of the dangers

of the surgery, she had gone ahead with the procedure because her quality of life was

so poor, that she was willing to accept the risk of death or paralysis.  [T. 1278].  The

Plaintiff's attorney asked her if she had been having headaches in June of 1990, and

the Plaintiff explained that, at that time, she had experienced migraines at least three

(3) time a month, and sometimes more frequently. [T. 1279-80]. She reported that she had initially received relief from the migraines by taking Fioricet or Fiorinal, [T. 1279], but that, after a while, the medicines ceased having a therapeutic effect. [T. 1280]. The Plaintiff testified that she was not able to do housework or household chores, while suffering from a migraine, but could only lie in a dark and quiet room. Id.

The Plaintiff's counsel next asked her about her employment history. Id. The Plaintiff noted that she had worked as a secretary, but that she would get migraine headaches at work, which would require co-workers to drive her home. Id. Asked about the period after 1990, when the Plaintiff was no longer working, and both of her children had been born, the Plaintiff explained that felt she would not have been able to work then, because of the frequency and intensity of her migraines and headaches, and because she would nap every day for one (1) to two (2) hours, while her children were asleep. [T. 1281].

The Plaintiff's attorney then asked her about the difference in her life after her diagnosis with an AVM. Id. The Plaintiff explained that she "used to do everything," but that, once the AVM manifested itself, she had to give up driving and grocery shopping, leaving those tasks to her husband. [T. 1282]. The Plaintiff's attorney

- 26 -

asked why she had started taking the medicine Ativan in 1990, and she explained that it was for anxiety and panic attacks.  [T. 1283].

The Plaintiff's attorney concluded by asking her if there was anything else she wanted to tell the ALJ, about what her life was like during the period of the late 1980s and early 1990s.  Id.  The Plaintiff replied that she felt that she was "so useless," because she had been able to "do everything" and then "just stopped."  Id.  She found herself unable to go outside, and just stayed in bed.  Id.  Finally, she noted that she believed that "it took six years, when [she] had that first stroke with [her] daughter, to finally * * * f[ind] out that [she had] that AVM."  Id.

The Medical Expert ("ME"), Dr. John W. LaBree, then briefly examined the Plaintiff.  [T. 1284].  The ME asked the Plaintiff about her long history of depression and panic attacks, and she indicated that she believed those were related to her AMV. Id.  The ME explained to the Plaintiff that he did not see any evidence in the Record to support her claim that she had a stroke during the birth of her second daughter in 1986, and added that the neurological examination conducted on the Plaintiff, at that time, was normal.  [T. 1285].

Next, the Vocational Expert ("VE"), Mr. Mitchell J. Norman, asked the Plaintiff about her work history as a secretary in the fifteen (15) years prior to her alleged onset

date.  Id.  The Plaintiff explained that she had worked for approximately three (3) years as an executive secretary at Amoco, but quit, in 1985, to have her first child.  [T. 1286].  As an executive secretary, she used a word processor, retrieved mail for the office, and answered telephones.  Id.  She did not have any employment after that date.  [T. 1287].

At this point, the ALJ noted that the Plaintiff seemed to want to add something to the ME's testimony.  [T. 1288].  The Plaintiff then explained that she had asked two (2) doctors to conduct an MRI on her at the time of her second daughter's birth, but that an MRI had not been performed, and her medical records from that period had subsequently been destroyed.  Id.

The next witness called was Lloyd George ("George"), the Plaintiff's husband. [T. 1289].  He explained that he married the Plaintiff, in Texas, in 1985, and that she had given birth to their first child that same year.  Id.  George confirmed that the couple's second child was born a year later, in 1986.  [T. 1290].  The ALJ then asked George about any changes in his wife's physical condition after the birth of their second child, and he testified that the Plaintiff "complained of having very severe headaches and * * * was very weak on the right side."  Id.  He reported that the Plaintiff went to "at least two dozen different physicians," in the two (2) to three (3)

- 28 -

years that followed the birth of their second child, seeking relief from those symptoms, and from upper back pain. Id.

George added that the Plaintiff's weakness was especially observable when she was cooking, because she would have to use her left hand, despite being right-handed. Id. He also testified that the Plaintiff's headaches increased in severity and duration after their second daughter's birth. [T. 1290-91]. The ALJ asked if the Plaintiff was using any assistive devices, such as wheelchairs or canes, at that time, and George responded that she was not. [T. 1291]. The ALJ then asked George about the Plaintiff's history of anxiety attacks. Id. He replied that she started having anxiety and panic attacks "around '89 or '90," and added that she was taken to the emergency room two (2) or three (3) times, but was never held overnight. Id.

The Plaintiff's counsel then examined George. [T. 1292]. He started by asking George about his employment at the time that he married the Plaintiff. Id. George responded that he had been working as an engineer for Amoco, but that he and the Plaintiff had moved to the Twin Cities because the Plaintiff had family in the area. Id. When asked by the Plaintiff's attorney if either he, or the Plaintiff, had considered applying for disability benefits at the time that she had first experienced physical difficulties, George testified that neither of them had thought of it. [T. 1293]. He

stated that, after their second daughter was born, the Plaintiff "began to have to take naps every day," experienced fatigue, and had to use her left foot to drive.  Id.

George recounted that the Plaintiff's father had first suggested that she apply for disability in 1995, or 1996.  Id.  The Plaintiff's attorney then asked George what he and the Plaintiff were told, when they contacted the Social Security Administration, and he explained that, to the best of his recollection, they were told that the Plaintiff was "ineligible."  Id.  When asked to clarify, whether the Social Security Administration had told them that she was not insured, of if they had said that she was not eligible, George repeated that he believed that they had told them, that she was not eligible.  [T. 1293-94].  George explained that, prior to the Hearing, he and his wife had attempted, unsuccessfully, to obtain medical records from all of the doctors that the Plaintiff had seen in the past.  [T. 1294].  The Plaintiff's attorney then asked George if, in his opinion, the Plaintiff could have performed a job for eight (8) hours a day, five (5) days a week, after her alleged stroke following the birth of their second daughter.  Id.  George responded that he did not believe that she could, because her right hand was almost useless, and she was so fatigued that she had to take naps of an hour to an hour and a half every day.  Id.

At that point, the ALJ asked the Plaintiff's counsel if he would stipulate to the qualification of the medical and vocational experts, and the Plaintiff's attorney agreed to do so. [T. 1294-95]. The ALJ then asked the ME what, if any, impairments he found the Plaintiff to have had prior to the expiration of benefits on December 31, 1990. [T. 1295]. The ME replied that, prior to 1990, there was a "paucity of records." Id. The ME testified that the only irregularities disclosed in the Plaintiff's Record, for the period prior to the expiration of her insured status, were some neck and shoulder pain complaints, following the birth of her second child in 1986, and, in 1989 and 1990, some irregular menstrual bleeding and periodic migraine headaches. Id. He also noted some evidence of panic disorder and depression, upon which he was not competent to assess. [T. 1296]. Finally, the ME noted that the Plaintiff had complained of right-sided headaches, that occurred three (3) to four (4) times a month, but he found that "this would not support a relationship to an AV malformation, essentially because many AV malformations go entirely asymptomatic until they bleed." Id. The ME thus concluded that the Plaintiff would not have met or equaled any listing prior to 1990. Id.

The ALJ then asked the ME about the relationship between the AVM and the Plaintiff's fibromyalgia, and the ME explained that they were not related. Id. The

- 31 -

ME noted that the Plaintiff's neurological examination, in 1992, was "entirely normal," except for some flattening of the nasal labial fold, which prevented him from finding any evidence of a past stroke. Id. The ALJ then asked the ME what restrictions, or limitations, he would have placed upon the Plaintiff for sustained work in 1990, and the ME indicated that he would have imposed no restrictions on the Plaintiff at that time. Id.

The Plaintiff's attorney then asked the ME some questions about medical transcripts from October 24, 1990, but the ME reported that he found them to be illegible. [T. 1297]. The ME admitted, upon questioning by the Plaintiff's attorney, that the Plaintiff's long history of headaches would not preclude a diagnosis of AVM, [T. 1298], but he reiterated that the majority of AVM patients were asymptomatic. [T. 1299]. The Plaintiff's attorney then asked if a person could have both migraine headaches, and tension headaches, and the ME answered affirmatively. [T. 1299]. He then asked if a person could have migraine headaches, tension headaches, and later have symptoms from an AVM. Id. The ME replied that the Plaintiff's attorney was "reaching." Id. The ME explained that an asymptomatic AVM could only be diagnosed by an MRI or a CT, [T. 1299-1300], and he added that the Plaintiff had, in fact, had carotid angiograms, or duplex studies performed, with normal results. [T.

1300].  The ME opined that it would be unusual for migraines to appear on the right side, with the AVM on the left.  Id.

The Plaintiff's attorney then asked the ME if, in his own clinical practice, he had treated clients who were unable to work because of migraine headaches.  Id.  The ME responded that he had, but that an inability to work would be determined based on the frequency of the headaches and, in the Record before him, he saw no indication that the Plaintiff had made repeated visits to her physicians seeking treatment for migraines.  Id.  When the Plaintiff's attorney explained that the Plaintiff had been unable to obtain many early medical records, the ME replied that he could not comment "on the absence of objective evidence."  Id.  The Plaintiff's attorney then asked the ME if there was a diagnostic test that would establish whether someone was experiencing a headache at the time that the test was administered.  [T. 1300-01].  The ME testified that there was not, but that observation could reveal the classical symptoms of a migraine.  [T. 1301].

Thereafter, the Hearing continued with the testimony of the Vocational Expert ("VE").  [T. 1301].  The ALJ posed a hypothetical to the VE, and asked him to assume an individual, thirty-one (31) years of age, with a twelfth grade education, and with the past work experience as set forth in the VE's report.  [T. 1301].  The ALJ related

- 33 -

that the hypothetical individual was impaired with headaches and possible panic and anxiety disorder, and was on a number of medications, the only apparent side effect of which was some sleepiness.  Id.  The hypothetical person could lift and carry fifty (50) pounds occasionally, and twenty-five (25) pounds frequently.  Id.  The person was further limited to work that was routine and repetitive, where there would only be brief and superficial contact with others in a low stress environment, and where minimal industrial standards for production and pace were applicable.  [T. 1301-02].

With those limitations in mind, the VE testified that the individual would be unable to perform any of the past jobs which had previously been held by the Plaintiff, and that she would have no transferrable skills.  [T. 1302].  The ALJ then inquired into the availability of any jobs at the medium level, which could be performed by the hypothetical individual. Id.  The VE testified that the minimal industrial standards of the hypothetical would be preclusive, because most of the medium range occupational jobs required that a product be put out at a certain level of speed.  Id.

The ALJ then posed a second hypothetical.  Id.  The ALJ posited a similar individual, who was limited to lifting and carrying twenty (20) pounds occasionally, and ten (10) pounds frequently.  Id.  The ALJ asked the ME to keep the same

restrictions in effect.  Id. The ALJ then asked if there would be any work, in the regional or national economy, for that hypothetical individual.  Id.  The ME testified that he believed the individual would be well-suited for work as a parking lot attendant -- a light-duty job with approximately 1,200 positions listed in the State Census.  Id.  The ME also testified that the individual could work as a copy messenger, which was also a light-duty job, with 1,520 positions listed.  Id.  The ALJ inquired if the individual would be able to perform any office or clerical positions, given the restrictions assumed.  Id.  The ME replied that a cashier position would also be suitable as a light-duty job, with 7,250 positions available in the State.  [T. 1302-03].

The ALJ then asked the VE if his recommendations would change if further restrictions were added, indicating that the individual could not perform overhead work or right foot pedal manipulation, and only occasional bending, stooping, crouching, crawling, and twisting, and no power gripping, twisting, or pounding. [T. 1303].  The VE replied that the added restrictions would not change his assessment. Id.

The Plaintiff's attorney then asked the VE how his assessment would change if the individual had to nap, or lie down and rest, for a minimum of one (1) hour,

- 35 -

during the middle of the day.  Id.  The VE replied that he thought "it would take a very understanding employer to allow that."  Id.  The Plaintiff's counsel then asked what the repercussions would be if the hypothetical individual had to nap or rest for as long as an hour and a half (1½) or two (2) hours, and the ME replied that that would be even more problematic. [T. 1304].  The Plaintiff's attorney then asked the VE if, in the course of his work in vocational rehabilitation, he had worked with people who suffered from migraine headaches.  Id.  The VE responded that he had and, in response to the Plaintiff's attorney's further inquiry, he explained that some of those people had difficulty sustaining work for eight (8) hours a day, five (5) days a week, on a long-term basis.  Id.

The ALJ then asked the Plaintiff if there was anything that she wanted to add to the Record before the conclusion of the Hearing.  Id.  She replied that she felt that it was hard "to even get all this stuff together," and stated that she could not read, write, or add.  Id.  She advised that she had an injury to her thalamus, and that she had pain throughout her right side. [T. 1304-05].  She added that, when she was diagnosed with her AVM, she had been told that it was extremely rare, and consequently, was difficult to diagnose.  [T. 1305].

The ALJ then asked the Plaintiff's attorney if he had any closing remarks.  Id. The Plaintiff's counsel argued that, even if the Plaintiff was not correct in attributing her headaches to the AVM, she was credible when she reported that she suffered from headaches and fatigue, which would have precluded full-time work on a sustained basis.  Id.  He stated that the Plaintiff had reported headaches consistently, and that her testimony was lent credibility by the fact that her family had moved to accommodate the Plaintiff's illness.  [T. 1306].  Finally, the Plaintiff's attorney argued that he felt that she should not be penalized for misinformation given to her by the Social Security Administration, which had mistakenly informed her that she could not file a claim because she was not insured.  Id.  The ALJ closed the Hearing by advising that she would review the Record and then make her decision. [T. 1307].

C.    The ALJ's Decision.  The ALJ issued her decision on April 18, 2003. [T. 36-50].  As she was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520 and 416.920.[18]  As a threshold

_____

[18]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities;

matter, the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity, since her alleged onset date.  [T. 37].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairments, which would substantially compromise her ability to engage in work activity.  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearings, the ALJ found that the Plaintiff was severely impaired by headaches, panic attacks with generalized anxiety, and depression.  [T. 41].

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20

_____

(3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

- 38 -

C.F.R. §§404.1520(d) and 416.920(d).   The ALJ determined that the Plaintiff's physical and mental impairments did not meet, or equal, the criteria of any Listed Impairment, based on the testimony of the ME, and the Record as a whole.  [T. 41].

The ALJ then discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure. See, Title 20 C.F.R. §§404.1520a and 416.920(a).  The four broad areas, which are relevant to the ability to work, are:  activities of daily living ("ADL"); social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id.  After examining the medical evidence, the ALJ concluded that the Plaintiff was subject to a Section 12.06 Anxiety Disorder, which is characterized by panic attacks with generalized anxiety, and a Section 12.04 Affective Disorder, which is characterized by depression, not otherwise specified.  Id.  The ALJ then addressed what limitations would result from the Plaintiff's mental impairment.  Id.

With regard to the pertinent factors, the ALJ determined that the Plaintiff was "moderately" impaired in her ADL, and "mildly to moderately" impaired in social functioning, and in her ability to maintain concentration, persistence, and pace.  Id.  Further, the ALJ concluded that the Plaintiff had not experienced any repeated episodes of decompensation.  Id.  In addition, the ALJ found that the Plaintiff's

- 39 -

impairments did not meet, or medically equal, the "C" criteria, with regard to either Section 12.04, or 12.06 of the Listings.  [T. 42].

The ALJ based that determination on the conclusions of Drs. Pon and Dupre, the records from the Plaintiff's treating physicians, and the evidence as a whole.  Id. The ALJ noted that the Plaintiff was able to take care of her two (2) children, as well as the three (3) young stepchildren of her spouse, on an every other week basis.  [T. 41].  She engaged in social activities for her husband's job, played softball in April of 1990, considered a vacation in August of 1990, and continued to do light cooking, cleaning, and laundry, around the house.  [T. 42].  The ALJ also commented that, according to the Record, the Plaintiff was involved in church and neighborhood activities, which reflected no more than a mild to moderate functional limitation.  Id. Finally, the ALJ observed that, while the Plaintiff demonstrated cognitive difficulties at the time of the Hearing, the Record did not contain any findings to reflect that those functional limitations began before the insured status expiration date.  Id.  An evaluation by Dr. Pon in 1988, and notes by Dr. Dupre in 1992, document a normal nervous system, and the Plaintiff testified that her memory problems did not begin until 1998.  Id.

The ALJ then proceeded to determine the Plaintiff's RFC.[19]  [T. 42].  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, she was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §§ 404.1529 and 416.929.  After considering the entire Record, including the testimony adduced at the Hearing;  the opinions of the Plaintiff's treating physicians;  the reports of Dr. Pon, and Dr. Dupre;  the impartial ME;  the objective medical evidence;  the State Agency consultants;  and the Plaintiff's subjective complaints of pain;  the ALJ determined the Plaintiff's RFC to be as follows:

> The [Plaintiff] retained the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently.  [The Plaintiff] could not perform overhead work and could not perform work requiring foot pedal manipulation on the right.  [The Plaintiff] required work involving only occasional bending, stooping, crouching, crawling[,] and twisting.  She could not perform work involving power gripping, twisting[,] or pounding.  [The Plaintiff] required routine and repetitive work tasks involving only brief and superficial interpersonal contact with other individuals.  She required a low stress

_____

[19]RFC is defined as the most an individual can still do after considering the effects of physical or mental limitations that impact upon that individual's ability to perform work-related tasks.  20 C.F.R. §§404.1545 and 416.945.

environment with minimum industrial standards of production and pace.

[T. 45].

The ALJ determined that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that she was disabled from all work activity by her impairments.  Id.

The ALJ also determined that the Plaintiff's subjective complaints of disabling pain were inconsistent with the Record prior to the insured status expiration date.  Id. The ALJ began by noting that, since the expiration date, the Plaintiff had been treated for breast cancer, had undergone neurosurgery with craniotomy for treatment of an AVM, and had been treated for RSD, acute appendicitis, as well as hip and pelvic fractures.  Id.  However, the ALJ explained that all of those impairments were first diagnosed, or treated, well after the insured status expiration date, and thus were not relevant to the Plaintiff's claim for disability benefits as of December 31, 1990.  Id. The ALJ further noted a paucity of documented medical records prior to December 31, 1990.  Id.

Those medical records that were available, however, revealed that chest and cervical spine x-rays were negative in October of 1986.  Id.  Similarly, the post-operative evaluation of the Plaintiff, following her surgery for varicose veins, was

normal, as was a Doppler ultrasound, although it showed a possible variance that was not unexpected in individuals of the Plaintiff's age.  Id.

The ALJ also relied on post-insurance status expiration date records to conclude that the Plaintiff was not disabled.  Id.  An examination on August 27, 1991, revealed tenderness in the mid-left trapezius, but also determined that the Plaintiff had good upper extremity strength and range of motion, and normal reflexes in all four (4) extremities.  Id.  The Plaintiff's diagnosis of fibromyalgia was neither fully documented, prior to the insured status expiration, nor was it sufficient to support the degree of functional impairment the Plaintiff alleged. [T. 46].  The ALJ found that the neurological evaluation of the Plaintiff, which was conducted in February of 1992, was significant for "unremarkable motor, sensory, reflex and coordination findings with normal ability for heel-and-toe walking."  Id.

The ALJ also found that the Plaintiff's treatment and reports of symptoms were at variance with her claimed disability prior to the insured status expiration date.  Id. While acknowledging that the absence of many of the Plaintiff's medical records made her assessment more difficult, the ALJ did not dispute that the Plaintiff was evaluated for her subjective complaints, and noted that the Record revealed that the Plaintiff was treated for headache and anxiety difficulties.  Id.  However, the Record

also contained reports that the Plaintiff's panic and depressive symptoms were in partial remission by February 26, 1991, which suggested that, "shortly after the insured status expiration date the claimant's mental health symptoms were not as debilitating as alleged." <u>Id.</u> As well, nothing in the Record documented that the Plaintiff had been hospitalized for any allegedly disabling condition prior to the insured status expiration date. <u>Id.</u>

The ALJ then discussed her finding that the Record did not support the degree of functional impairment alleged. <u>Id.</u> Evidence in the Record disclosed that the escalation in the Plaintiff's headache symptoms worsened after her move in 1991. <u>Id.</u> The Plaintiff was diagnosed with an AVM in February of 1992, and a statement by Dr. Steiner indicates that the Plaintiff's anxiety "[could] not be directly related to the AVM." <u>Id.</u> In addition, Dr. Steiner noted that the Plaintiff enjoyed "generally good health," allowing a reasonable inference that the Plaintiff was not then reporting to her physicians the degree of impairment alleged at the Hearing. [T. 47]. The Record also disclosed a four (4) week history of onset severe right-sided weakness in April of 1995, which the ALJ found did not suggest the presence of those impairments on a sustained basis prior to the insured status expiration date. <u>Id.</u> The ALJ saw no indication in the Record that the Plaintiff relied on any assistive devices before the

insured status expiration date, and noted that the Plaintiff's history of medication use did not support her claimed degree of impairment.  Id.

The ALJ considered medical source statements, that were included in the Record, giving the Plaintiff all reasonable doubt, and  found the opinion of the ME, that the Plaintiff had no functional limitations, reasonable in view of the paucity of medical records.  Id.  Dr. Hoj's statement on October 1, 2002, that he believed the Plaintiff to have been disabled prior to December 31, 1990, was considered by the ALJ, but she noted that Dr. Hoj admitted that there were no medical records, or CT scans in the Record, which supported that opinion.  Id.  For that reason, the ALJ found that Dr. Hoj's opinion, based largely on the Plaintiff's subjective reporting, and pertaining to events twelve (12) years in the part, was not persuasive.  Id.

Dr. Evers opined that the Plaintiff would not have been capable of simple unskilled tasks in 1992, however the ALJ found that the opinion was not material to the inquiry at hand, and she declined to give his opinion significant weight.  [T. 47-48].  The ALJ similarly found Dr. Hess' opinion, in November of 2002, not persuasive, as he had not treated the Plaintiff until well after her insured status expiration date.  [T. 48].

The ALJ also considered the Plaintiff's employment history, and her motivation for work, and found, based on her testimony concerning the importance of her parental responsibilities, that the Plaintiff did not have a substantial motivation to return to full-time employment.  Id.

Finally, the ALJ weighed the third party reports which had been submitted in support of the Plaintiff's claims, including the letters by Pastors Rutschow and Witte. Id.  The ALJ found that those individuals were not familiar with the Plaintiff prior to the insured status expiration date.  Id.  The ALJ evaluated a letter from Pastor Gleske, which concluded that the Plaintiff was disabled, but found that the letter was too vague, and non-specific, to be probative of disability.  Id.  However, the ALJ relied on Pastor Gleske's letter to assist her in determining the Plaintiff's RFC.  Id. Similarly, the ALJ found that the letter from the Plaintiff's sister-in-law was not persuasive of disability.  Id.  While her sister-in-law observed that the Plaintiff's condition progressively worsened between 1989, and 1992, that did not establish disability prior to the insured status expiration.  Id.  The ALJ determined that the statement from the Plaintiff's brother-in-law was significant in that it reported that she would take naps when he visited, but that the opinion was based on intermittent

observations, and was not sufficient to maintain a claim of disability regarding the Plaintiff's daily functioning.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC which the ALJ had found, that the Plaintiff could not perform her past relevant work.  [T. 48].

Accordingly, the ALJ noted that the burden shifted to the Commissioner to establish the final step; namely, whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given her RFC, age, education, and work experience.  Id.  The ALJ noted that the Plaintiff was currently 48 years old, which is defined as a younger individual for all times relevant to the adjudication.  [T. 49]; see also, Title 20 C.F.R. §§404.1563, and 416.963.  As related by the ALJ, considering the Plaintiff's age, education, past relevant work experience, and RFC, the VE had opined that the Plaintiff could perform work as a parking lot attendant, of which there were 1,200 jobs in the regional economy which met the proposed hypothetical; as a copy messenger, of which there were 1,520 job listed; or as a cashier, of which there were 7,250 jobs listed.  Id.  Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background,

and RFC, the ALJ concluded that the Plaintiff was not disabled, and therefore, was not entitled to a period of disability, or DIB.  [T. 50].

## IV.  Discussion

A.     Standard of Review.   The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a

Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."  Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996), superceded by statute on other grounds, 162 F.3d 533 (8th Cir. 1998).  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris

v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.    Legal Analysis. In support of her Motion for Summary Judgment, the Plaintiff advances the following arguments:

1.      The ALJ Did Not Correctly Infer the Onset
Date of Disability.

2.      The ALJ Failed to Grant the Proper Weight to
Retrospective Medical Opinions.

3.      The ALJ Improperly Discounted the
Plaintiff's Subjective Complaints.

4.      The ALJ Improperly Omitted Fatigue from
Her Hypotheticals.

5.      The ALJ Improperly Described Headaches In
Her Hypotheticals.

We address each contention in turn.

1.      Whether the ALJ Correctly Inferred the Onset Date of Disability.

a.      Standard of Review.   As here pertinent, Social Security

Ruling 83-20 sets out the factors to be considered when establishing an onset date of

disability.  See, Social Security Ruling 83-20; see also, Grebnick v. Chater, 121 F.3d

1193, 1200 (8th Cir. 1997), citing and quoting, Title 20 C.F.R. §422.406(b)(1)(once

published, Social Security Rulings are "binding on all components of the Social

Security Administration.").  "The starting point in determining the date of onset of

disability is the individual's statement as to when disability began," and that date

should be used "if it is consistent with all the evidence available."  Social Security

Ruling 83-20, supra at *2.   When a plaintiff claims that she was disabled by a degenerative disease, but does not have contemporaneous medical evidence of the onset date of the disease, then, in addition to her testimony, "the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnosis of her doctor."   Grebenick v. Chater, supra at 1199; see also, Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006), citing Grebenick v. Chater, supra at 1200; Vogt v. Barnhart, 2003 WL 403345 *8 (D. Neb., February 21, 2003).

"The date alleged by the individual should be used if it is consistent with all the evidence available."   Karlix v. Barnhart, supra at 747, citing and quoting Social Security Ruling 83-20, supra at *1.  If the onset date can not be clearly determined by examining the medical evidence, the ALJ should rely on the opinion of an ME to determine a medically reasonable onset date.  See, Karlix v. Barnhart, supra at 747; Grebenick v. Chater, supra at 1201, citing DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991)("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination."); see also, Reid v. Chater,

71 F.3d 372, 374 (10th Cir. 1995); Spellman v. Shalala, 1 F.3d 357, 362-63 (5th Cir.

1993).

> b.    Legal Analysis.   The onset date in this case is largely

determinative of the result that the ALJ reached.  The Plaintiff argues that the ALJ did

not have a legitimate basis for inferring the onset date of either her migraines or

fibromyalgia, because the ME did not provide her with an inferred onset date.  As a

threshold matter, the Plaintiff raises the prospect that, at the Hearing, both the ALJ and

the ME were mistaken about the correct date for the expiration of insured status,

incorrectly believing it to be "prior to 1990," rather than the correct date of December

31, 1990.  A review of the Record reflects that there was some confusion during the

Hearing:

> ALJ:  Doctor, can you indicate what, if any, impairment
> you find with this claimant - - and it must be prior to
> the DLI of December 30, 1990.
>
> ME:  Prior to - - you said it's '91?
>
> ALJ:  '90.
>
> ME:  Prior to 1990, there's a paucity of records, Your
> Honor * * *.

[T. 1295].

- 53 -

The ME continued to display some apparent confusion a few moments thereafter, when he testified that he found nothing "to suggest that there was any disability prior to 1990," id., or to suggest that the Plaintiff's disabilities met or equaled any listing "prior to 1990." [T. 1296].

The Plaintiff contends that these excerpts fails to adequately disclose the date last insured, that was employed by the ME, and therefore, the ME's testimony cannot be considered substantial evidence, and the ALJ erred in relying upon it. While we are discomforted by the seeming misunderstanding about the appropriate date last insured, we conclude that any apparent misunderstanding was not so undermining as to negate the value of the ME's testimony in assisting the ALJ to render her determination. The exchange between the ALJ and ME reveals some confusion, but the ME appears to understand that he was being asked to evaluate the Plaintiff's record through the end of 1990. For example, in response to the ALJ's questioning, the ME explained that "I don't have any record, Your Honor, after * * * 1989 and 1990," an clear indication that he was considering records from 1990 in his answer to the ALJ's questioning. [T. 1295].

In addition, the ME testified that he relied, in part, on an "entirely normal" neurological examination of the Plaintiff, that was conducted in 1992. [T. 1296].

- 54 -

Finally, to the extent that there was any confusion, the Plaintiff's attorney further clarified the situation when he questioning the ME about the medical records from late October of 1990, which the ME answered without protest.  [T. 1297].

The Plaintiff also contends that the ALJ improperly determined the onset date of disability by failing to clarify, with the ME, that the ME could rely on records, and medical histories, which were dated after the DIB deadline, as well as on retrospective opinions, and lay opinions.  The only support the Plaintiff offers for this argument, however, is the ALJ's failure to make that explicit point on the Record, as well as the ME's candid observation that he was unable to comment "on the absence of objective evidence."  [T. 1300].  At no point, in the Record, did the ALJ inform the ME that he was not to consider valid medical evidence, whether it predates, or postdates the date last insured, and the ME's comment, that was referenced by the Plaintiff, suggests no more than the obvious, that one cannot comment on evidence that has not been presented because it was, reportedly, destroyed.  Moreover, we consider, here, the opinions of a credentialed physician, whose foundation for the opinions expressed was conceded by the Plaintiff.  We see nothing in this Record to suggest that the ME was misled into believing that all of the skills, which are routinely employed by such professionals, to determine the date of disability, were abandoned by the ME here.

Finally, the Plaintiff argues that the Record fails to establish a legitimate medical foundation for the ALJ's finding, that the Plaintiff was not disabled by headaches or fibromyalgia prior to 1991, as is required by Social Security Ruling 83-20.  Essentially, the Plaintiff claims that the ME's evaluation of her migraine headaches, as well as her fibromyalgia, was cursory, and therefore, should not have been relied upon by the ALJ.  In support of the contention, the Plaintiff first points to the ME's comment on her headaches and, notably, his statement that her complaints of headaches "would not support a relationship to an AV malformation."  [T. 1296]. While the Plaintiff claims that such a statement is irrelevant, as it is the effect, and not the cause of her headaches that is critical to the ALJ's assessment, the ME was, in fact, responding to the Plaintiff's own assertion, earlier in the Hearing, that her AVM gave rise to her headaches.  See, [T. 1265, 1278, 1305].  The ME acknowledged that the Plaintiff's medical records mentioned right-sided headaches occurring three (3) to four (4) times per month, prior to the expiration of DIB, but without evidence in the Record to reflect that her symptoms, during those incidents, were disabling, he was unable to comment further.  [T. 1295].

Likewise, we cannot agree with the Plaintiff that the ME failed to infer an onset date for her fibromyalgia.  Similar to the ME's assessment of the Plaintiff's

- 56 -

headaches, his comment concerning the disabling effect of the Plaintiff's fibromyalgia, was in response to a direct inquiry, this time, from the ALJ.  In response to the ALJ's question -- whether the AVM and the fibromyalgia were definite diagnoses prior to 1990 -- the ME replied that the two (2) conditions were not related. [T. 1296].  While at least two (2) medical notes in the Record suggest that the Plaintiff was diagnosed with fibromyalgia prior to December 31, 1990, [T. 319, 338], there is no documentary evidence that the Plaintiff manifested any symptoms that could be considered disabling prior to that date.  Accordingly, we find that the ALJ, based upon the testimony of the ME, and on the Record as a whole, properly inferred the onset date of the Plaintiff's disability.

2.      Whether the RFC Assessed by the ALJ Was
Incorrect.

The Plaintiff argues that the RFC, which was determined by the

ALJ, was incorrect because the ALJ failed to afford proper weight to the retrospective

medical opinions of the Plaintiff's treating physicians, because she failed to accord the

proper weight to the Plaintiff's subjective complaints of pain, and because she

improperly omitted fatigue, and mischaracterized headaches, in the hypotheticals she

formulated.  We disagree.

a.      The Weight Given to the Retrospective
Medical Opinions of the Plaintiff's
Treating Physicians.

(1)     Standard of Review.  Retrospective medical diagnoses

are considered relevant evidence to assist an ALJ in determining the degree of

disability prior to the expiration of the insured period.  See, Meinders v. Barnhart, 195

F. Supp. 2d 1136, 1142 (S.D. Iowa, 2002); see also, Jones v. Chater, 65 F.3d 102, 104

(8th Cir. 1995).  An ALJ must not reject a physician's retrospective diagnosis when it

is supported by evidence in the Plaintiff's medical records.  See, Epperson v. Apfel,

1999 WL 33656852 *6 (N.D. Iowa, March 31, 1999), citing Grebenick v. Chater,

supra at 1199.

"Where the impairment onset date is critical, however, retrospective medical opinions alone will usually not suffice unless the claimed onset date is corroborated, as by subjective evidence from lay observers like family members." Jones v. Chater, supra at 104; Cossette v. Apfel, 242 F.3d 374 *2 (8th Cir. 2000)(Table Decision); List v. Apfel, 169 F.3d 1148, 1149 (8th Cir. 1999). Evidence from outside the relevant time period cannot be the only support relied on by the ALJ for a determination of disability, as "such a holding would be contrary to the Social Security Act, 42 U.S.C. §§ 416(i), 423(c), which requires proof of disability during the time for which it is claimed." Meinders v. Barnhart, supra at 1142, quoting Pyland v. Apfel, 149 F.3d 873, 878 (8th Cir. 1998).

(2)    Legal Analysis. The Plaintiff argues that the ALJ incorrectly dismissed the retrospective medical opinions of Drs. Hoj, Evers, and Hess. Plaintiff's Memorandum in Support, supra at 45-50.

In support of the contention, the Plaintiff first claims that the ALJ should have relied on the opinion of Dr. Hoj, that she was disabled by her AVM prior to 1991, as he based his opinion on the available medical record, is a specialist in neurology, and is currently treating the Plaintiff for her AVM. Id. at 45-46. The evidence in the Record, which is cited by the Plaintiff, however, is largely conclusory, and we are

persuaded that the ALJ correctly relied on the available record in her determination that the Plaintiff was not disabled.  The other justifications cited by the Plaintiff for reassessing the testimony of Dr. Hoj are simply not relevant.  We acknowledge that the opinions of a specialist are accorded greater weight than the opinion of a general physician, but that rule does not apply where, as here, "the opinion of the specialist is controverted by substantial evidence or is otherwise discredited."  Prosch v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000).  Indeed, specialists are given no greater deference in assessments, which are not based on substantial evidence in the Record or objective findings, than are non-specialists, see, Garcia v. Barnhart, 114 Fed. Appx. 809, 809-810 (9th Cir. 2004), and in this case, the Plaintiff fails to cite any medical evidence that would support Dr. Hoj's retrospective assertions.

The Plaintiff claims that the ALJ also wrongly disregarded Dr. Evers' retrospective medical opinion.  Id. at 47-48.  The ALJ rejected Dr. Evers' opinion because it did not discuss the Plaintiff's symptoms prior to the expiration of her insured status on December 31, 1990.  [T. 47-48].  The Plaintiff's argument, that Dr. Evers' opinion should be accepted because it is "relevant" and because he has "knowledge of Social Security regulations like a medical expert," does not satisfy any standard of which we are aware.  Plaintiff's Memorandum in Support, supra at 47-48.

While an ALJ may rely on retrospective medical opinions that are corroborated by lay testimony, she is not required to take an uncorroborated physician's retrospective opinion that the Plaintiff was "disabled" on face value, alone. The ALJ considered the lay testimony submitted in the Record, and found that none of that evidence established a disability prior to the expiration of the insured status expiration date. [T. 48].

Lastly, the ALJ rejected Dr. Hess's retrospective opinion, which was rendered in 2002, that the Plaintiff was "permanently and totally disabled," as irrelevant because the opinion did not relate to the period when the Plaintiff was insured. [T. 157]. The Plaintiff concedes this point, but suggests that the ALJ had an affirmative duty to "resolve inadequate, conflicting, or ambiguous evidence by first recontacting medical sources." Plaintiff's Memorandum in Support, supra at 49. The Plaintiff cites Leitzke v. Callahan, 986 F. Supp. 1216, 1225 (D. Minn. 1997), to support her claim that the ALJ erred by failing to require Dr. Hess to refocus his letter.

We recognize that, since Hearings before an ALJ are non-adversarial, an ALJ does have an obligation to fully and fairly develop the Record, even if the Plaintiff is represented by counsel, id., and must further develop the Record if she feels that the professional opinions, which were available to her, were insufficient to form the basis

of her determination of disability.  See, <u>Lauer v. Apfel</u>, 245 F.3d 700, 706 (8th Cir.

2001), citing <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000).  As long as the ALJ

develops a "reasonably complete Record," however,  "the ALJ is not required * * *

to function as the Plaintiff's substitute counsel."  <u>Id.</u>, citing <u>Clark v. Shalala</u>, 28 F.3d

828, 830-31 (8th Cir. 1993).

Ultimately, "[i]t is the ALJ's function to resolve conflicts among the opinions

of various treating and examining physicians," and we are satisfied that the ALJ's

resolution is consistent with the Record as a whole.  <u>Pearsall v. Massanari</u>, supra at

1218-19, citing <u>Jenkins v. Chater</u>, 76 F.3d 231, 233 (8th Cir. 1996); <u>Estes v. Barnhart</u>,

supra at 725; <u>Bentley v. Shalala</u>, 52 F.3d 784, 785-87 (8th Cir. 1995).   Since we

conclude, based upon our thorough review of the Record, that the Record was

adequately developed by the ALJ, and her appraisal of the conflicting expert opinions

was compliant with the governing law, we will not recommend a reversal and remand

on those grounds.

        b.    <u>The Failure to Credit the Plaintiff's</u>
             <u>Subjective Complaints of Pain</u>.

           (1)    <u>Standard of Review</u>.  The governing law makes clear

that credibility determinations are initially within the province of the ALJ.  See,

- 62 -

Driggins v. Bowen, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.  See, Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990).  These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.  See, Johnson v. Secretary of Health and Human Services, 872 F.2d 810, 814 n.3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny.  See, e.g., Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823 (8th Cir. 1996).  Factors which the ALJ must consider, in the evaluation of the

Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.      the claimant's daily activities;

2.      the duration, frequency, and intensity of the pain;

3.      precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of medication; and

5.      functional restrictions.

Polaski v. Heckler, supra at 1321-22.

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them.  Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1995)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain).  It is also firmly established that the

physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. See, Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied. For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling. See, Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988). By the same token, "[i]nconsistencies between subjective complaints of pain and daily

living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997) (ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487. Among the daily activities, which counterindicate disabling pain, are: a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; and grocery shopping, Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996). Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

(2)   Legal Analysis.   In arriving at her RFC, the ALJ found the subjective testimony of the Plaintiff, as well as her spouse, to be sincere, but not fully supported by the available record, which had significant inconsistencies. [T. 45]. Guided by Polaski, and its progeny, the ALJ found the credibility of the Plaintiff, as to the severity of her impairments, to be undermined by her medical records, her treatment and reports of symptoms, and the lack of hospitalizations, as well as by her daily activities. In particular, the ALJ noted that the Plaintiff's breast cancer, AVM,

RSD, appendicitis, and hip and pelvic fractures, took place after the insured status expiration date, while the majority of the Record did not establish a disabling condition prior to December 31, 1990.  [T. 45].

In discounting the Plaintiff's testimony, the ALJ referenced specific medical evidence that related to the Plaintiff's complaints.  Specifically, the ALJ found that chest and cervical spine x-rays, which were taken in 1986, were negative; that post-operative notes, following the Plaintiff's elective varicose vein stripping surgery, reported her to be "normal;" and that a Doppler ultrasound, which was performed in August of 1990, was also determined to be normal, and showed a possible variance that was not unusual in someone of the Plaintiff's age.  Id.  The ALJ also considered post-insurance status expiration date records in making her evaluation, and found that those records revealed that, in August of 1991, the Plaintiff had normal reflexes in all extremities and, while she carried a diagnosis of fibromyalgia, nothing in the Record indicated that she was functionally impaired by that, or by any other disorder.  [T. 45-46].

The ALJ found that the Plaintiff was evaluated for her subjective complaints of headache and anxiety, but concluded that her treatment history, and reports of symptomology, were not consistent with her claimed disability prior to the insured

status expiration date. [T. 46]. The Plaintiff's husband testified that she was never

hospitalized for anxiety or panic attacks, and a physician's notation, from February

of 1991, recorded that her anxiety symptoms were in partial remission, suggesting to

the ALJ that treatment had been at least somewhat effective. Id. In addition, later

records reflected that the Plaintiff's headaches, and right-sided weakness, had

worsened subsequent to December 31, 1990. [T. 46-47]. The ALJ also cited a

medical record from 1992, in which the Plaintiff's physician wrote that she was in

"generally good health." [T. 47]. The ALJ acknowledged that the Plaintiff's use of

medications was difficult to reconstruct, given the paucity of the Record from the

applicable period, but noted that the first mention of Ativan, for anxiety, was in

September of 1990, which undermined the Plaintiff's assertion that she suffered from

anxiety to the extent alleged. Id.

The ALJ also found that the Plaintiff's daily activities were inconsistent with

the degree of impairment that she was claiming. The ALJ relied on the Hearing

testimony, which reflected that the Plaintiff retained her capacity to care for five (5)

small children, perform household work, go to movies, play softball, undertake social

activities related to her husband's employment, and consider vacations, which

demonstrated that the Plaintiff was able to function at a level that was accommodated

by the ALJ's RFC.   These findings are supported by substantial evidence in the Record as a whole.

"The ALJ is in the best position to gauge the credibility of testimony and is granted deference," Sarna v. Barnhart, 32 Fed.Appx. 788, 791 (8th Cir. 2002), and "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record."  Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); see also, Estes v. Barnhart, supra at 724, citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  We find no basis to reverse the Plaintiff's believability rulings, and we reject that challenge to the ALJ's decision.

> c.  The Assertedly Improper Omission of Fatigue and Mischaracterization of Headaches in the Hypotheticals.

(1)  Standard of Review.  In determining the Plaintiff's RFC, and in framing an appropriate hypothetical for a VE, the ALJ need only include the limitations she accepted, as supported by substantial evidence.  See, Pertuis v. Apfel, 152 F.3d 1006, 1007 (8th Cir. 1998); Rappoport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991).  However, when an ALJ finds that a Plaintiff suffers from impairments, the hypothetical posed to the VE must include those impairments.  See, Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997); Newton v. Chater, 92 F.3d 688,

- 69 -

694-95 (8th Cir. 1996)("A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant."), citing Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).   Those facts in the hypothetical are designed to replicate the Plaintiff's RFC, so as to allow the VE to identify jobs in the economy, if any there be, which an individual, with functional limitations like those of the Plaintiff, would be able to perform.   See, Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).

Moreover, it is well-settled that the testimony of a VE, which is based upon a properly-phrased hypothetical question, constitutes substantial evidence.   See, e.g., Howard v. Massanari, supra at 582; Warburton v. Apfel, 188 F.3d 1047, 1049 (8th Cir. 1999); Porch v. Chater, 115 F.3d 567, 571 (8th Cir. 1997).   In order to rely upon a VE's opinion, however, the hypothetical posed "must fully set forth a claimant's impairments."   Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994), citing Totz v. Sullivan, 961 F.2d 727, 730 (8th Cir. 1992).

(2)    Legal Analysis. The Plaintiff contends that the ALJ's hypothetical was flawed, because she omitted fatigue, and imprecisely characterized the Plaintiff's headaches, in the assumptions posed to the VE.   The Plaintiff maintains

- 70 -

that, in the absence of those limitations, the hypothetical questions, which were asked of the VE, were incomplete.

The ALJ specifically found that the Plaintiff was severely impaired by headaches, anxiety and depression, but only moderately impaired in her activities of daily living, and mildly to moderately impaired in social function, and in her ability to maintain concentration, persistence, or pace, with no episodes of decompensation. [T. 41]. Those impairments were included in both the ALJ's RFC, and in the hypotheticals posed to the VE. [T. 45, 1301-1303]. The VE responded that there were a significant number of jobs available in Minnesota, including 1,200 jobs as a parking lot attendant, 1,530 jobs as a copy messenger, and 7,250 jobs as a cashier, which would be consistent with those limitations. [T. 1302-03].

Moreover, we have already determined that the ALJ thoroughly reviewed the Record, and properly discredited the Plaintiff's subjective complaints. As we have noted, the ALJ need only include the limitations she accepted, as supported by substantial evidence, in the hypotheticals submitted to the VE. See, Pertuis v. Apfel, supra at 1007; Rappoport v. Sullivan, supra at 1323. Since we find that the complaints, which the Plaintiff seeks to include in the hypothetical, were not

supported by substantial evidence on the Record as a whole, those hypotheticals, and the VE's opinions, which were predicated thereon, were not in error.

Lastly, as we have previously detailed, the Plaintiff submitted additional evidence to the Appeals Council, some of which was not available for the ALJ's review.  Up to this point, the principal focus of our analysis was the propriety of the ALJ's rulings, on the Record submitted to her.  As we have particularized, we find no error in the ALJ's analysis, or findings, which would warrant a reversal and remand. Nonetheless, given the submission of materials to the Appeals Council, our task on review is not completed until we "determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1068 (8th Cir. 2000), quoting <u>Riley v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1999); see also, <u>Flynn v. Chater</u>, 107 F.3d 617, 621 (8th Cir. 1997).  "Evaluating such evidence requires us to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." <u>Jenkins v. Apfel</u>, 196 F.3d 922, 924 (8th Cir. 1999), citing <u>Riley v. Shalala</u>, supra at 622.

Here, much of the evidence proffered to the Appeals Council duplicated that offered at the ALJ's Hearing.  Some of the evidence registers, by comparison to other

appraisals, disagreement as to when the Plaintiff was first diagnosed with AVM, but that evidence, when considered in the context of the Record as a whole, reflects that the impairment was diagnosed well after the Plaintiff's last date insured. We accept that evidence, which postdates the last date insured, can still be relevant in identifying when a medical condition became disabling, but we find no such showing in the additional records presented to the Appeals Council. Simply stated, following a close review, we conclude that the ALJ would not have altered her original assessment of the Record on the whole by any of the newly submitted evidence, as that evidence does not undermine, in any substantive way, the ALJ's original findings.

In sum, finding no error in any aspect of the Commissioner's decision, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1. That the Plaintiff's Motion [Docket No. 6] for Summary Judgment be denied.

2.    That the Defendant's Motion [Docket No. 14] for Summary Judgment be granted.

Dated: December 28, 2006                      s/Raymond L. Erickson
                                              Raymond L. Erickson
                                              CHIEF U.S.  MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **January 16, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **January 16, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.

- 74 -